Ivanhoe F. MILLER, Plaintiff,

v.

State of DELAWARE, DEPARTMENT OF PROBATION AND PAROLE, Defendant.

Ivanhoe F. Miller, Plaintiff,

v.

State of Delaware, Department of Probation and Parole, Defendant.

Nos. Civ.A. 98–553–GMS, Civ.A. 99–565–GMS.

United States District Court, D. Delaware.

Aug. 28, 2001.

Herbert G. Feuerhake, Wilmington, DE, for Plaintiff.

Gregory E. Smith, Deputy Atty. General, Dept. of Justice, for Defendant.

### *MEMORANDUM AND ORDER*

SLEET, District Judge.

On September 24, 1998, Ivanhoe F. Miller ("Miller"), filed a *pro se* complaint alleging that his employer, State of Delaware Department of Probation and Parole, a division of the Department of Correction ("DOC"), violated Title VII of the Civil Rights Act of 1964. Specifically, Miller alleges that the DOC suspended and later terminated his employment based on his race. On August 20, 1999, Miller filed a companion case concerning the same set of facts alleging that the DOC retaliated against him when he complained of their alleged discriminatory conduct. The court consolidated these two cases on February 15, 2000. Presently, before the court is the DOC's motion for summary judgment. Upon consideration of the parties' submissions and the applicable principles of law, the court concludes that Miller has failed to establish a prima facie case of discrimination or retaliation. Therefore, the court will grant the defendant's motion for summary judgment. The following sections explain the reasons for the court's decision more thoroughly.

### I.  BACKGROUND

Miller began his employment with the DOC on October 1, 1994, as a Probation and Parole Officer. During the summer of 1997, Miller lost his department-issued weapon.[1] He alleges that the weapon was stolen from his apartment on Saturday,

---

1.  The exact date of the loss is uncertain.

July 19, 1997, by a female guest, Linda Wilson ("Wilson"). That same day, Miller conducted an exhaustive search of his apartment, his car, and his locker at the Probation and Parole Office. The weapon was not found during the search. Miller then returned to his home and placed a call to a psychic in an effort to locate the weapon.[2] He then called a co-worker, Kathy Schaap ("Schaap"), and told her about the situation. Schaap notified his supervisor, Phyllis Ryan ("Ryan"), about the missing weapon. Ryan contacted Miller and instructed him to report the incident to the police.

In response, Miller reported the lost weapon to the New Castle County Police. Officer Rob Joseph responded and interviewed Miller at his apartment that same Saturday evening. During the interview, Miller stated that he believed the weapon was stolen by Wilson. Officer Joseph was concerned about Miller's behavior throughout the interview and had doubts that Wilson was involved as Miller claimed. As a result, Officer Joseph contacted Ryan who informed him that a Probation and Parole Officer must carry their duty pistol during field work, and that Miller had not performed field work in the two weeks prior to the incident. She stated the possibility that the handgun may have been lost or stolen during this time period.

On Sunday, July 20, 1997, Officer Joseph requested that Miller participate in another interview at the New Castle County Police headquarters. Miller freely attended this second interview driving his own car both to and from the police station. During the course of second interview, Miller changed his version of the loss of the handgun. In the second account, Miller stated that the weapon was stolen from the trunk of his Toyota Camry while parked at a supermarket two weeks prior. Miller asserts that he told the second version because in order to end the questioning and leave, he felt that he had to tell Officer Joseph what he believed the officer wanted to hear. In particular, he alleged that the second version was the result of him being "coerced" into "lying." Undisputed evidence in the record demonstrates that Miller was not under arrest, placed in handcuffs, or physically abused during the inquiry.

Shortly after the reported loss, Miller was suspended and subsequently terminated on July 22, 1998, by the DOC. In addition, Miller was criminally charged and prosecuted by the State of Delaware for official misconduct and falsely reporting an incident. On March 13 and March 16, 1998, he was tried and acquitted on the criminal charges. Subsequently, Miller successfully had his arrest record expunged.

## II. STANDARD OF REVIEW

A moving party is entitled to summary judgment as a matter of law if there are no genuine issues of material fact. Fed. R.Civ.P. 56(c) (2000).

When a motion for summary judgment is made, the moving party has the initial burden of identifying the absence of material fact within the nonmoving party's claim. Once the moving party meets this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The nonmoving party may not rest upon the mere allegations or denials of the adverse party's pleading. To support its claim, the nonmoving party

---

**2.** The weapon is unclear as to what the psychic told Miller about the location of the weapon.

must show that there will be testimonial, documentary, or other evidence that demonstrates a genuine issue of material fact. 11 *Moore's Federal Practice*, § 56.11 (Matthew Bender 3d ed.2000). If the non-moving party does not meet this burden, summary judgment, if appropriate, will be entered. Fed.R.Civ.P. 56(e). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Scala v. Delaware Dept. of Correction*, 2001 WL 641075, at *11 (D.Del. May 22, 2001) (internal citations omitted).

### III. DISCUSSION

In its motion for summary judgment, the defendant argues that it is entitled to judgment as a matter of law because 1) Miller did not timely file his state law claims, 2) Miller cannot establish a prima facie case of discrimination or retaliation, and 3) even if Miller could establish a prima facie case, the DOC had a legitimate, non-discriminatory reason for Miller's termination. The court will individually address each argument as presented.

#### A. Title VII Filing Requirements

In Title VII cases, claims are properly presented to the court only after administrative remedies have been exhausted. *See Anjelino v. New York Times*, 200 F.3d 73, 87 (3d Cir.1999). A claim of employment discrimination under Title VII must be filed with the Equal Employment Opportunity Commission ("EEOC") within

180 days of the last alleged discriminatory act. 42 U.S.C. § 2000e–5(e) (1994). Once a plaintiff has received a "right to sue" letter from the EEOC, the plaintiff has 90 days to file a complaint in court. *See Figueroa v. Buccaneer Hotel Inc.*, 188 F.3d 172, 175 (3d Cir.1999).

On March 27, 1998, Miller filed a charge of discrimination with the Philadelphia office of the EEOC against the DOC. Miller filed a second charge of discrimination alleging retaliation on August 20, 1998. Miller obtained his first right to sue letter from the EEOC concerning his suspension on June 30, 1998. He filed his first suit on September 14, 1998. He obtained his second letter concerning his termination on May 24, 1999. He filed his second suit on August 20, 1999. Miller filed an amended complaint, which included state law claims, on January 23, 2001.

■ The DOC does not dispute that Miller properly filed with the EEOC before filing a complaint with the court. It also does not dispute that the claims Miller presented to the EEOC are consistent with the allegations he made in his timely-filed initial complaint with the court. However, the DOC disputes whether the state law claims added to Miller's amended complaint in January of 2001 were timely filed.[3] Specifically, the defendant contends that because the scope of the EEOC investigation defines the parameters of the civil action before the District Court, Miller's state law claims must be dismissed. The court disagrees.

Just as the court was not persuaded by the defendant's opposition to Miller's motion to amend, it finds the defendant's argument that Miller's state law claims are untimely to be without merit.

---

**3.** The defendant opposed Miller's motion to amend because it contends that the amended claims would have been filed outside the nine-

ty day window permitted by statute. See D.I. 27.

The defendant relies on *Figueroa v. Buccaneer Hotel Inc.*, 188 F.3d 172, 175 (3d Cir.1999) in support of its argument. The court finds *Figueroa* is clearly inapposite because the plaintiff in that case failed to file her federal claims until 169 days after she received a right to sue letter. *See id.* The court dismissed her remaining state law claims for lack of subject matter jurisdiction. *See id.* Most important, *Figueroa* is silent as to the issue of amending timely filed federal claims with related state law claims arising from the same set of facts.

The proper inquiry of timeliness, as Miller correctly pointed out in his answering brief (D.I.59), involves the application of the state statute of limitations concerning each state claim. There is no need to consider the 90–day right to sue window for state law claims. Moreover, the defendant clearly concedes that Miller recited substantially similar facts in both his EEOC charges of discrimination and his unamended complaints. The state law claims are predicated upon those same facts. Therefore, the court concludes that Miller's amended complaint including state law claims was timely filed under the state statute of limitations.

## B. Discrimination and Retaliation Claims

Under Title VII,
it shall be an unlawful employment practice for an employer to ... discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a).

In Title VII discrimination and retaliation cases, the court applies the McDonnell Douglas three-step burden shifting analysis. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). First, the plaintiff has the initial burden of establishing a prima facie case of discrimination. If the prima facie requirement is satisfied, the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory reason for the employment decision. If the employer does so, the burden shifts back to the plaintiff to show the nondiscriminatory reason offered by the defendant-employer was a mere pretext for discrimination. *See McDonnell Douglas,* 411 U.S. at 801, 93 S.Ct. 1817.

### 1. Miller's Prima Facie Case

Miller alleges that he was suspended and then fired because he was black. Specifically, he contends that white officers in similar situations were administered substantially more lenient sanctions. Miller also alleges that the DOC retaliated against him when he complained about their discriminatory practices. In contrast, the DOC asserts that Miller cannot establish prima facie case of either discrimination or retaliation because he was suspended and terminated not because of his race or the fact that he lost his weapon, but because he gave multiple accounts in explaining the loss of his weapon. The court will first address whether Miller has proven prima facie cases of racial discrimination and retaliation.

### a. Racial Discrimination Claim [4]

In order to establish a prima facie case of discrimination, Miller must show

---

**4.** Although Miller's complaint does not identi-

fy under what theory of discrimination the

that: (1) he or she is a member of a protected class; (2) he or she is qualified for the former position; (3) he or she suffered an adverse employment action; and (4) non-members of the protected class were treated more favorably than the plaintiff. *See Goosby v. Johnson & Johnson Medical, Inc.,* 228 F.3d 313, 318–319 (3d Cir.2000); *Ezold v. Wolf, Block, Schorr and Solis–Cohen,* 983 F.2d 509, 522 (3d Cir.1992).

■ The parties agree that the first three prongs needed to establish a prima facie case of racial discrimination have been established. Miller, a black man, is a member of a protected class. Thus, he satisfies the first element. The parties also agree that when Miller was suspended and terminated from his employment, he was qualified for the position, and an adverse employment action was taken. Thus, he satisfies the second and third elements. The parties disagree, however, as to whether Miller can establish that nonmembers of the protected class were treated more favorably.

■■ Miller argues that because two white officers who were "similarly situated" to him were not suspended or terminated, he has established a prima facie case of discrimination. In particular, Miller claims that the two white officers were similarly situated to him because they also lost their weapons. In order for an employee to be considered similarly situated, for the purpose of showing disparate treatment in Title VII cases, "the plaintiff must prove that all of the relevant aspects of his employment situation are nearly identical to those of the ... employees whom he alleges were treated more favorably." *Al-*

*len v. Ohio Department of Rehabilitation and Correction,* 128 F.Supp.2d 483, 492 (2001). In other words, "to be deemed similarly situated, the individuals with whom a plaintiff seeks to be compared must 'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Anderson v. Haverford College,* 868 F.Supp. 741, 745 (E.D.Pa.1994) (citations omitted).

After reviewing the evidence in the light most favorable to Miller, the court concludes that Miller was not similarly situated to the white officers who also lost their guns. It is undisputed that Miller gave conflicting accounts of how he lost his weapon. Moreover, it is also undisputed that the two white officers who lost their guns, but were not suspended or fired, did not give conflicting accounts regarding the loss of their weapon. Finally, Miller concedes that he cannot point to another Probation and Parole Officer, black or white, who engaged in similar cover-up after losing his or her weapon and who received a less severe sanction. In light of these undisputed facts, it cannot be said that the officers outside of the protected class were treated with greater leniency than Miller. It is irrelevant that all of the officers lost their weapons. Rather, the critical factors are that Miller gave varying accounts as to how he lost his weapon and failed to report the loss in a timely manner. As opposed to Miller, the two white officers *did not* give conflicting versions about the loss of their weapons. Because Miller cannot demonstrate that nonmembers of the protected class who were similarly situated to

plaintiff is proceeding, the court construes the complaint as alleging a violation under the disparate treatment theory. A disparate treatment violation is made out when an individual of a protected group is shown to have been

singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII. *See Opportunity Comm'n v. Metal Serv. Co.,* 892 F.2d 341, 347 (3d Cir.1990).

him were treated more favorably, he cannot establish a prima facie case of racial discrimination. *See Blanding v. Pennsylvania State Police*, 12 F.3d 1303, 1309 (3d Cir.1993) (affirming district court's finding that white officers who were not probationary employees were not similarly situated to black probationary employee even though all had been involved in incidents of domestic violence); *Allen*, 128 F.Supp.2d, at 494 (holding that a white office was not similarly situated to a black officer who was charged with more offenses than the white officer).

### b. Retaliation Claim

After Miller's suspension, and his criminal trial, which occurred on March 13 and March 16, 1998, Miller filed a charge of discrimination on March 27, 1998. Thereafter, Miller was terminated by letter dated July 22, 1998. Based on these alleged facts, Miller claims that the DOC impermissibly retaliated against him for filing a charge of discrimination. See 42 U.S.C. § 2000e–3(a).[5]

In order to satisfy his prima facie burden with respect to his retaliation claim, Miller must show: (1) that he engaged in protected employee activity; (2) suffered an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a that there was a causal connection between the employee's protected activity and the employer's adverse action. *See Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir.1997).

After reviewing the facts in the record in the light most favorable to Miller the court concludes that he has sufficiently established a prima facie case of retaliation. It is undisputed that Miller filed a charge of discrimination and was subsequently fired within approximately three months. Thus, the court finds that Miller meets the first two prongs of his prima facie case with respect to retaliation.

■ As to the third prong, the court finds that there is a sufficient causal link between Miller's conduct and his termination. Examining the temporal proximity between the employee's protected activity and the adverse employment action is an obvious method by which a plaintiff can proffer circumstantial evidence "sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). The events at issue must not only be proximate, but their timing must be " 'unusually suggestive' of a retaliatory motive before a causal link will be inferred." *Krouse v. American Sterilizer Co.*, 126 F.3d at 503. In this case, approximately three months passed between the date that Miller filed his first charge of discrimination and his termination. There is no evidence in the record of intervening conduct by Miller that could have lead to his termination. Construing the evidence in the light most favorable to Miller, the court concludes that he has adequately shown a causal link, and thus, has established a prima facie case of retaliation.

### 2. Legitimate, Nondiscriminatory Reasoning

After the plaintiff establishes a prima facie case of either retaliation or discrimi-

---

**5.** "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... to discriminate against any individual ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, asserted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a)

nation,[6] the burden shifts to the defendant employer to demonstrate a legitimate, nondiscriminatory reason for the adverse employment action.[7]

█ The DOC proffered four reasons for Miller's termination in the July 22, 1998 termination letter. Specifically, the DOC cited: 1) the loss of the firearm, 2) conflicting accounts of the loss, 3) the failure to promptly report the loss and 4) the failure to notify his supervisor and submit a report. The court finds that the DOC has met its burden by proffering legitimate, nondiscriminatory reasons for Miller's suspension and termination.

### 3. Pretext

█ Once the employer satisfies its "relatively light burden," "the burden of production rebounds to the plaintiff, who must [then] show by a preponderance of the evidence that the employer's explanation is pretextual." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994). A plaintiff may then survive summary judgment by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir.2000); *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d

1101, 1108 (3rd Cir.1997). Thus, to meet his burden, Miller must proffer sufficient evidence which would allow a fact finder to reasonably believe that the nondiscriminatory reasons were either fabricated, or not the actual motives for the suspension and termination. *See Fuentes v. Perskie*, 32 F.3d at 764.

The court finds that Miller has not met this burden. Miller has failed to adduce any evidence that would discredit the DOC's reasons for suspension and termination or that would demonstrate that discrimination was more likely than not a determinative factor underlying these actions.

Miller's primary argument is that other officers (white) have lost their weapons and were not terminated. These white officers were given a five-day suspension, unlike Miller, who was suspended for several months without pay. On the surface, it appears that the white officers were treated with more leniency; however, the key reason set forth by the DOC, namely the fact that Miller gave conflicting versions of the loss, must be given weight. In order to discredit the DOC's proffered reason for his suspension and termination, Miller claims that he was coerced into giving conflicting accounts about the loss of his weapon and that he was acquitted of the criminal charge of falsely reporting an incident.[8]

**6.** Although the court has found that Miller has failed to establish a prima facie case of discrimination, the court will discuss the DOC's proffered reasons for suspending and firing Miller and whether Miller has proven those reasons to be pretextual in relation to his retaliation claim. Under the *McDonnell Douglas* three-step burden shifting analysis, the analysis for Miller's discrimination and retaliation claims is the same.

**7.** Although the burden shifts, it is important to understand that "[t]he ultimate burden of persuading the trier of fact that the defen-

dants intentionally discriminated against the plaintiff remains at all times with the plaintiff." *See Burdine*, 450 U.S. at 252–53, 101 S.Ct. 1089.

**8.** Miller also claims that the DOC's reasons were pretextual because he did report the loss of his weapon in a timely manner. The DOC maintains that Miller was untimely in reporting the loss. The timeliness of Miller's report, of course, depends on when the weapon was actually lost. If Miller's first version is to be believed, the loss was reported within six hours. If the second version is believed, how-

First, although Miller suggests that the second version was a result of police coercion, he has adduced no affirmative evidence to support this assertion. Miller drove to and from the interview in his own car. During questioning, Miller was not under arrest, and he admits that there were no threats or physical assault. He suggests that Officer Joseph "verbally coerced" him into giving the second version by informing him that his supervisor had not seen him with his weapon or perform fieldwork in two weeks. Miller asserts that he was worn down under the questioning and said what he thought Officer Joseph wanted to hear. Under the circumstances of this case, the court cannot conclude that Miller's will was overborne. Miller has extensive training in law enforcement. Before becoming a probation and parole officer, he served as a member of the Tulsa Police Department in Tulsa, Oklahoma for approximately four years. Miller also conceded that when he confronting a probationer whom he believed to be untruthful, he would accuse the individual of being less than candid with him. Given the lack of evidence of the use of other forms of coercion during the interrogation, Miller's training in law enforcement as a probation and parole officer, and his knowledge of interrogation tactics, the court concludes that no reasonable jury could find that Miller was tricked into lying by Officer Joseph. Ultimately, Miller admits to giving varying accounts of how his weapon was lost. Thus, he has not demonstrated that this reason proffered by the DOC was a pretext.

As to Miller's acquittal in the underlying criminal trial, the court finds that this fact does not create a genuine issue for trial because the acquittal does not render the DOC's proffered reasons for the suspension and termination false, or make the alleged discrimination real. Although the State failed to convict Miller, this does not prove him innocent. Miller's acquittal merely means that the State failed to prove each and every element of the charged offense beyond a reasonable doubt. In order to raise a genuine issue for trial, Miller "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108–09 (3d Cir.1997) (citations omitted). A reasonable jury could not on the basis of Miller's acquittal, or taken together with other facts in the record, reasonably conclude that the DOC discriminated against Miller.

Finally, Miller has failed to demonstrate any evidence that race played a role in his suspension or termination. Miller concedes that no employee of the DOC directed racial epithets towards him, or in any way suggested that his race was an issue in his suspension or termination. Miller has offered no evidence which would demonstrate that any individual at the DOC harbored racial bias against him. Most important, he has offered no evidence which would demonstrate that Commissioner Stanley Taylor, the final decision maker regarding Miller's termination, con-

ever, the loss would have been reported almost two weeks after the incident. Because Miller has given conflicting stories, this information cannot be ascertained. This dispute does not create a genuine issue of material fact, however, because Miller has failed to offer any evidence demonstrating that the

DOC's key reason—that he was terminated because he gave conflicting accounts, was pretextual. Thus, even if Miller is to be believed in that he reported the loss within six hours, it appears that he still lied during the investigation in describing how and when his weapon was lost.

sidered his race as a factor. *See Blanding*, 12 F.3d at 1309 (affirming district court's grant of summary judgment where plaintiff adduced no evidence that race played a role in his discharge). Because there is no evidence in the record to support a suspicion that racial animus was an issue in Miller's suspension and termination, Miller has failed to prove that the DOC's profferred reasons were pretextual. Therefore, Miller's claims for discrimination and retaliation under Title VII fail, and the DOC is entitled to judgment as a matter of law.[9]

## IV. CONCLUSION

For the foregoing reasons, the court concludes that Miller has failed adduce evidence from which a reasonable factfinder could conclude that the DOC's legitimate, non-discriminatory reason for his suspension and termination were pretextual.

Therefore, IT IS HEREBY ORDERED that:

C. The defendant's motion for summary judgment (D.I.46) is GRANTED.

---

9. In his amended complaint, Miller sets forth state law claims for malicious prosecution, violation of the Covenant of Good Faith and Fair Dealing, and violation of Delaware's anti-discrimination statute, 19 Del. C. § 711.

Because the court is granting the DOC's motion for summary judgment, supplemental jurisdiction will not be exercised over the state claims and the court will not address these claims.